**AARON D. FORD**
**Nevada Attorney General**
ERNEST D. FIGUEROA
Consumer Advocate
LUCAS J. TUCKER (Bar No. 010252)
Senior Deputy Attorney General
State of Nevada, Office of the Attorney General
Bureau of Consumer Protection
8945 W. Russell Road, #204
Las Vegas, Nevada 89148
702-486-3256 ph
ltucker@ag.nv.gov

*Attorneys for State of Nevada*

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In Re:<br><br>CAT DETAILING LLC,<br><br>Debtor. | CASE NO: 21-11823-ABL<br><br>CHAPTER 7 |
| STATE OF NEVADA, ex rel. AARON D. FORD, Attorney General,<br><br>Plaintiff,<br>v.<br><br>CAT DETAILING LLC,<br><br>Defendant. | Adv. Pro. No. 22-____________ |

**COMPLAINT FOR DECLARATORY RELIEF**

TO THE HONORABLE AUGUST LANDIS,
UNITED STATES BANKRUPTCY JUDGE:

The State of Nevada *ex rel.* Aaron D. Ford, the Nevada Attorney General (the "State") files this *Complaint for Declaratory Relief* (the "Complaint") and respectfully states as follows:

## I. JURISDICTION AND VENUE

1. This Complaint concerns CAT Detailing, LLC, a Nevada limited liability company that is the Debtor in a voluntary petition for Chapter 7 bankruptcy, filed as Case No. 21-11823-ABL, *In re: CAT Detailing, LLC*, in the United States Bankruptcy Court for the District of Nevada.

2. This Court has jurisdiction over the subject matter of this Complaint pursuant to 28 U.S.C. §§ 157(b) and 1334(b). This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (2)(K).

3. Venue in this district is proper pursuant to 28 U.S.C. § 1408 and 1409.

4. In reference to Fed. R. Bankr. P. § 7008, the Plaintiff State of Nevada consents to entries of final orders or judgments by the bankruptcy court.

## II. PARTIES

5. Plaintiff is the State of Nevada, ex rel. Aaron D. Ford as the Nevada Attorney General, by and through Ernest Figueroa, Consumer Advocate and Chief Deputy Attorney General, whose investigation of the Defendant provides the basis for this action.

6. Defendant CAT Detailing, LLC ("Debtor" or the "Defendant"), is the debtor in this proceeding and may be served, pursuant to Rule 7004(b)(9) of the Federal Rules of Bankruptcy Procedure, by mail to the Debtor at the address shown in its Voluntary Petition, at: 1027 South Rainbow Blvd., #167, Las Vegas, Nevada 89145.

## III. BACKGROUND

7. Prior to the April 12, 2021 filing of the Defendant's petition for bankruptcy, the State was conducting an investigation of the Defendant's business practices, and that investigation was conducted by the Consumer Advocate and its Bureau of Consumer Protection pursuant to Nev. Rev. Stat. §§ 228.310, 228.380.

8. In the course of its pre-petition investigation, the State issued a subpoena to the Defendant on March 16, 2021.[1]

[1] See ECF 65, Ex. 2.

9. Instead of producing documents responsive to the State's pre-petition subpoena, the Defendant filed a petition for Chapter 7 bankruptcy on April 12, 2021.

10. Despite the Defendant's evasive tactics, the State's pre-petition investigation gave it reason to believe that Defendant had engaged in deceptive trade practices.[2]

11. After the Defendant filed its petition for bankruptcy, the State (i) reviewed the Defendant's filed Schedules and Statement of Financial Interest [ECF 20], (ii) filed a Notice of Appearance and Request for Special Notice [ECF 25], and (iii) attended the Defendant's 341 meeting of creditors, which convened on May 19, 2021 and was continued on May 26, 2021.

12. The Defendant's filed Schedules, and specifically Parts 3 and 11 of Schedule A/B, identify various accounts receivable and related causes of action as the substantial portion of the Defendant's assets.[3]

13. Based on its pre-petition investigation, the State believed that these accounts receivable and related causes of action were all the product of the same deceptive trade practices that were the focus of the State's pre-petition investigation.

14. Accordingly, the State filed an *Ex Parte* Motion for Rule 2004 Examination of the Debtor on July 20, 2021 [ECF 45].[4]

15. As stated in its motion, the State's request for a Rule 2004 Examination was directly related to matters which may effect the administration of the Debtor's estate.

16. Specifically, the State sought to examine (i) issues with respect to certain causes of action against third parties listed among the Debtor's schedule of assets, (ii)

---

[2] The nature of the Defendant's conduct which the State discovered in its pre-petition investigation is summarized in ECF 75 at p.3, ln. 1 – 21.

[3] In a different context, the causes of action listed in Part 11 of Schedule A/B reappear in Part 3 of the Debtor's Statement of Financial Affairs. [ECF 20 at pp. 39 – 43].

[4] The State filed a similar motion to conduct a Rule 2004 Examination of the Debtor's commonly-owned affiliate Luft Heating & Air Conditioning, LLC, which is the debtor in Case No. 21-11824-ABL. Although the State conducted that separate examination in conjunction with its examination of the Defendant, this complaint is focused on the Defendant because the Defendant is the plaintiff in the relevant causes of action, and is the party to the relevant mechanic's liens and related contracts described herein.

issues with respect to the Debtor's accounts receivable referenced in the Debtor's schedule of assets, and (iii) issues with respect to the acts, conduct, or property of the Debtor or the bankruptcy estate. [ECF 45 at p. 2, ln. 19 – 25].

17. The State's *Ex Parte* Motion was granted by an Order signed by the Clerk of Court on July 23, 2021 [ECF 52].

18. The State later filed its proof of claim on September 14, 2021. [ECF Claim No. 39].

19. The Defendant sought to vacate the State's Rule 2004 Examination,[5] and the State opposed those efforts.[6] This court considered the arguments of all parties at a hearing on September 15, 2021.

20. On October 8, 2021 the Court issued its oral ruling finding the State had good cause to conduct an examination of the Defendant and allowing the State's examination to proceed.

21. The State's Rule 2004 examination consisted of (i) reviewing documents produced by the Defendant in response to a subpoena duces tecum issued by the State on July 29, 2021 ("Defendant's Documents"), and (ii) taking the testimony of the Defendant's representative at an examination held on January 13, 2022.

22. As further described in Sections VI and VII, *infra*, the Defendant's Documents and testimony of the Defendant's representative are noteworthy both for what they clearly say, and what they do not, or refuse to, say. These statements and omissions establish a clear pattern of fraudulent or otherwise unlawful conduct that is intertwined with the causes of action listed on the Debtor's schedules, and the related liens and contracts that serve as the basis for those causes of action.

23. In addition, records kept in the normal course of business by third-party agencies further illustrate the scheme which the Defendant's prior customers fell prey to,

---

[5] See generally ECF 61, 65, and 83.

[6] See generally ECF 75 – 76.

and which still haunts them as defendants in causes of action that are still pending, and which are listed as assets on the Debtor's Schedule A/B.

24. Thankfully, prior bankruptcy courts have realized that a debtor may seek to use the bankruptcy proceeding as a means to further or shield its unscrupulous conduct, and have thus held that property obtained by fraud of the debtor is not properly part of the assets of the bankruptcy estate.

25. Based on the evidence gathered by the State, the State now files this Complaint seeking appropriate relief declaring that all the causes of action listed as assets on the Debtor's Schedule A/B are excluded from the bankruptcy estate for the reasons described herein.

## IV. THE STATE'S *PARENS PATRIAE* INTEREST

26. Aside from being a creditor in this matter, the State has standing to pursue its requested relief because of its recognized *parens patriae* interest.

27. The Supreme Court has held that a state has a "quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general," and can therefore protect these interests. *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982).

28. Courts also recognize that a state can properly exert its *parens patriae* authority to protect the rights of citizens and residents who are not likely to avail themselves of their individual remedy due to the burden of pursuing the action; states have a quasi-sovereign interest in protecting their economic health. *Minn. v. Standard Oil Co.,* 568 F.Supp. 556, 564 (D.Minn. 1983).

29. This is also true in a bankruptcy context. In *In re SCBA Liquidation, Inc.*, the court first observed several cases where an attorney general invoked *parens patriae* to file nondischargeability actions on behalf of injured or defrauded citizens. 489 B.R. 666, 685 (Bankr.W.D.Mich. 2013). The court then found the same logic applied to whether *parens patriae* was a proper basis for the state to file representative claims in that action:

> "[T]he same considerations that give rise to *parens patriae* standing in nondischargeability cases support the conclusion that *parens patriae* gives the Six States authority to file representative breach of warranty claims with the Class. Although the primary purpose of the Six State Claims is to protect the economic interests of individual vest purchasers, ***the claims also represent an attempt to protect the States' quasi-sovereign interest in ensuring the general economic well-being of all consumers***. Application of this doctrine under these specific facts permit the Six States to protect "the little guys." *Id.* (emphasis added).

30. Similarly, in *In re Suwinski*, the court found the Ohio Attorney General had *parens patriae* authority to protect the interests of individual consumers facing foreclosure:

> "***The [state] has an interest beyond that of each individual*** in ensuring that those who do business within this state comport with a basic level of fairness in all their dealings." *Massachusetts v. Bartel (In re Bartel)*, 403 B.R. 173, 176 (Bankr.D.Mass.2009) (*citing Snapp*, 458 U.S. at 607, 102 S.Ct. 3260). . .The indirect effects indicated by Plaintiff's allegations are significant . . .The potential for indirect injury to the state as a result of the foreclosures and economic losses suffered due to the alleged fraudulent practices would be ***even broader than those suffered by any one of those 92 individuals***. The state has a great interest in protecting its citizens from losing property due to fraudulent practices."
> *In re Suwinski*, 509 B.R. 568, 573-574 (Bankr.S.D. Ohio, 2013) (emphasis added).

31. The third-parties who are subject to collection efforts, some of whom are also creditors in this action, are not sophisticated businesses with substantial financial reserves. Rather, they are homeowners facing an action to foreclose on their home or other collection efforts because the Debtor has listed their respective causes of action as alleged assets in its Schedules.

32. Based on a review of public records, many homeowners are not represented by counsel and, represented or not, they have an economic incentive to settle their individual dispute rather than paying the cost of defending a suit on its merits.

///

///

///

33. Faced with the prospect they might lose their home in a housing market that is increasingly expensive and unaffordable,[7] homeowners have incentive to settle their suits for peace of mind rather than assume the risk, and legal costs, of continued litigation.

34. Yet, these homeowners should not need to defend or settle causes of action that should be excluded from the bankruptcy estate due to Defendant's fraud.

35. Having concluded its Rule 2004 Examination of the Debtor, the State believes there is adequate evidence that these alleged assets stem from a common pattern of fraudulent conduct, and the State now seeks appropriate relief.

36. Finally, a state's attempt to address the alleged injury to the health and well-being of its citizens through its sovereign lawmaking process indicates that a state has a valid *parens patriae* interest. *Snapp*, 458 U.S. at 607. In this case, the State's pre-petition subpoena illustrates the State's pre-petition attempt to address this harm.

## V. NATURE OF THE DEFENDANT'S BUSINESS

37. The following description of the Defendant's business is based on prior statements by the Defendant's representative in this matter, the content of the Defendant's Documents reviewed by the State, and the testimony of the Defendant's representative at the January 13, 2022 examination.[8]

38. Defendant was a general contractor licensed by the Nevada State Contractor's Board.

39. From 2009 until 2021, the Defendant performed general construction and painting services, including demolition services associated with repair or remodel of residential homes.

---

[7] https://www.reviewjournal.com/business/housing/las-vegas-housing-market-kicks-off-2022-with-new-price-record-2526119/

[8] The State does not seek today to use the deposition testimony of the Defendant's representative pursuant to LR 7032 and Fed. R. Civ. P. 7032. Rather, the State includes select alleged testimonial statements of Debtor's representative in this Complaint to demonstrate the State has a good faith basis to seek its requested relief.

40. Defendant conducted business under the name of "Bolmer Restoration," and Defendant presented itself to the public as a restoration company by means of its chosen fictitious name and various provisions in the contracts Defendant presented its customers.

41. During the 12 years it was in business, Defendant provided services for approximately 365 jobs per year, averaging one job per day, per year.

42. Many of the Defendant's customers were also customers of the Defendant's commonly-owned affiliate, Luft Heating & Air Conditioning, LLC, doing business as "Rooter Man."[9]

43. In a common scenario, a homeowner would first contact Rooter Man due to some plumbing problem in the customer's home.

44. Rooter Man's representative would respond to the call, and often inform the customer that the plumbing issue had caused water damage to the premises.

45. The Rooter Man representative would then refer the customer to the Defendant for various services including, but not limited to, water mitigation, mold remediation and asbestos testing and abatement.

46. In most cases, the Rooter Man representative presented the customer with an electronic tablet containing a document that would authorize the Defendant to contact the customer's insurance company (where applicable) and begin its water mitigation services.

47. The Defendant would then begin work at the customer's property less than 3 days after the customer's initial contact with Rooter Man, and often within 24 hours after the customer's initial contact with Rooter Man, under the guise that "emergency services" were needed.

///

[9] Rooter Man is the subject of its own petition for Chapter 7 bankruptcy in Case No. 21-11824-ABL. The State conducted a separate Rule 2004 Examination of Rooter Man on the same date as, but prior to, the examination of the Defendant.

48. Customers signed the authorization document presented by the Rooter Man representative, but it is unclear from the Defendant's Documents what document the customers actually saw at the time of signature, or what document the customers believed they were signing.

49. According to the Defendant's Documents, the various customers allegedly signed Property Services Contracts, whose provisions are more fully described in Section VI of this complaint.

50. Based on a clear reading of these contracts, and as more fully described in Section VI(A) *infra*, the Defendant:

a) Retained complete discretion over whether, and when, to begin its work;

b) Despite being in business since 2009 and performing 365 jobs per year, was incapable of providing customers with any price estimates for allegedly needed services, nor any definite statement about the specific services to be provided or the materials used;

c) Refused to provide a final invoice to its customers and their insurance companies until after its work was complete;

d) Despite being in business since 2009 and performing 365 jobs per year, could not determine or calculate any final price until its services were complete;

e) Calculated all prices under a closed-book arrangement, meaning that the Defendant did not report the cost of labor and materials to the Customer, and the Defendant's pricing could only be determined by the Defendant upon substantial completion of the project; and

f) Cautioned its customers about services that could be provided by either the customer or the Defendant, specifically "Content-In/Content-Out/Pack-In/Pack-Out" services, described as moving the Customer's property, furniture, etc., in or out of the affected room(s)/property.

51. Because Defendant did not provide its price calculations until after completing its services, the Defendant could not know what services, or prices for services, would be approved by any customer's insurance company.

52. Even with this uncertainty, the Defendant allegedly committed to performing substantial work of significant value, allegedly worth up to tens of thousands of dollars or more, with no guarantees of payment from the customer either; the contracts required no down payments and no credit check ratings from its customers.

53. Even though the Defendant did not provide its invoices until after its work was complete, Defendant would later typically discount the value of its completed services by significant amounts, e.g. thousands, not hundreds, of dollars.

54. Even though Defendant's invoices were allegedly based on completed work, Defendant's invoices contained alleged "errors" in multiple cases, causing the Defendant to adjust its prices for certain completed services based on these errors.

55. When insurance companies asked for time sheets of the Defendant's technicians in order to verify the hours of labor claimed, Defendant refused.

56. In fact, Defendant would not agree to provide insurance companies any information to verify the number of hours claimed to have been worked by its technicians.

57. The Defendant produced its invoices using a software called "Xactimate."

58. The Xactimate software used customary pricing and rates for a particular geographic market as the default rate, but also allowed any individual contractor to adjust these rates up or down when generating its invoices.

59. As a normal course of practice, the Defendant recorded notices of liens on its completed projects. Liens were recorded on 30 – 40% of all of the Defendant's projects.

60. Once a lien was recorded, the Defendant generally did not amend its liens, even after it received a subsequent payment from the homeowner.

61. When a lien included amounts for services by subcontractors or third-parties, those amounts included overhead and profit, or other unspecified mark-ups, charged by the Defendant even though Defendant did not provide those services.

62. All of the Defendant's recorded liens stated one amount as the "amount of lien," regardless of the categories of services that comprised that amount.

63. Accordingly, many of the Defendant's recorded liens include amounts for non-lienable services.

64. Among the Defendant's Documents are bill summaries that show many of the liens recorded by the Defendant included amounts for non-lienable services. In several of those cases, the amount of non-lienable services constituted more than 10%, and up to 88.3%, of the total lien amount.

65. Yet, none of the Defendant's recorded liens make any distinction between amounts for lienable versus non-lienable services.

66. Instead, the Defendant purposely lumped all lienable and non-lienable amounts together in every Notice of Lien without any distinction.

67. In cases where the amount of lien included asbestos abatement services, and the asbestos abatement was provided by a third-party, the final amount charged for asbestos abatement to the customer was higher than the amount charged by the third-party that actually performed the asbestos abatement.

68. The Defendant's Documents do not include any documents explaining why the amounts charged by Defendant to its customers for asbestos abatement were significantly higher than the amounts charged by the third-party that actually performed the abatement.

69. Yet, the Defendant's liens that include asbestos abatement incorporate the higher amounts charged by the Defendant to its customers.

70. In less than 25% of cases, the Notices of Lien recorded by the Defendant were signed by someone with actual authority to act on behalf of the Defendant.

71. In all other cases, the Notices of Lien recorded by Defendant were signed by someone else with no authority to act on behalf of Defendant.

72. Yet, Defendant purposely recorded Notices of Lien regardless of whether the signatory had authority to act on the Defendant's behalf.

73. In 70% of cases, the Defendant's recorded liens were signed by the mother of the Defendant's representative.

## VI. RELEVANT FACTS ESTABLISHED BY WHAT THE DEFENDANT'S DOCUMENTS AND TESTIMONY CLEARLY SAY

74. The causes of actions listed in the Debtor's schedules are actions to enforce various mechanic's liens, and those liens are based on alleged contracts between the Defendant and several former customers.[10]

75. The Defendant's Documents and testimony of the Defendant's representative confirm significant patterns which bear on the validity of the causes of action.

### A. What the Defendants' Contracts Clearly State

76. The Defendant's Documents included copies of Property Services Contracts ("Service Contracts"), all naming the Defendant and various former customers as parties.

77. Across the Defendant's Documents, the State observed four different forms of Services Contracts, one of which was contracts with manual signatures. The Defendant's Documents included three Services Contracts that appeared to be manually signed.

78. Aside from the manually signed contracts, about 95% of all Services Contracts appeared to have been signed electronically, as evidenced by (i) the identical form and placement of signatures or initials on all pages, and (ii) the inclusion of a Signature Certificate produced by an online document signing service. Hereafter, the State refers to these specific contracts as evidencing "Digital Transactions."

79. For the Digital Transactions, the State observed three slightly different forms of Service Contracts.[11]

---

[10] These actions customarily include causes of action for breach of contract, which concern the same alleged contracts that serve as the basis for the various mechanic's liens.

[11] The differences largely consist of (i) some content being reorganized among the various versions, or in some cases omitted, and (ii) the inclusion or exclusion of various Disclosures about the Defendant's licensure with the Nevada State Contractors' Board, the rights of lien provided by NRS Chapter 108, the identity of certain potential subcontractors, and the Residential Construction Recovery Fund.

80. However, both the manually signed Service Contracts, and each form of the Service Contracts used for Digital Transactions share important common features.[12]

81. With two exceptions, page 1 of all Service Contracts is limited to a preamble, followed by four different recitals, and then followed by the customer's initials or signature. The "Contractual Terms" do not begin until page 2.

82. All Services Contracts contain repeated references to emergency circumstances in the second recital, and Sections 1(a) and 2(a) of every contract.

83. Section 1(a) of all Services Contracts provides the Defendant with complete discretion to "decide to start or not to start work under verbal or written approval."

84. Section 2(a) of all Services Contracts states that the Defendant was "incapable of providing Customer with an exact and detailed written estimate of the Services to be performed upon arrival to the Property at time of execution of this Agreement, with a statement of the materials to be used, specifications for the Services, or an approximate completion date for the Services."

85. Further, Section 2(a) of all Services Contracts states that the Defendant would not provide a final invoice to its customers and their insurance companies until "the completion of the Services under the Scope of this Contract."

86. Section 2(a) of all Services Contracts also states that "the [Defendant's] final invoice cannot be determined or calculated until the Service is completed."

87. Section 2(b) of all Services Contracts states that "[the Defendant] is calculating a price under a closed-book arrangement, so the [Defendant] does not report the cost of labor and materials to the Customer. Also, because the price cannot be created upfront then pricing shall be determined by the [Defendant] upon substantial completion of the project."

///

[12] The common features described in paragraphs 81 through 88 are also included in the forms of contracts already provided by the State in its earlier filing, ECF 112, Exhibits A and B.

88. Finally, Section 4(c) of all Services Contracts discusses what the Defendant referred to as "Content-In/Content-Out/Pack-In/Pack-Out" services, and described such services as moving the Customer's property, furniture, etc., in or out of the affected room(s)/property.

89. At the State's Rule 2004 examination of the Debtor's representative, the State presented one of the manually signed Service Contracts, and each version of the Services Contracts used in Digital Transactions to the Debtor's representative.

90. At the same examination, the State then read into the record the provisions described in Paragraphs 82 to 88 from one of the contracts, confirmed that the Debtor's representative saw the language read, and asked the Debtor's representative to review those same provisions in the other three contracts provided.

91. After reviewing those provisions in each contract, the Debtor's representative confirmed that the provisions described in Paragraphs 82 to 88 were present in every form of Service Contract that he reviewed.

92. Defendant did not negotiate these provisions with any customer; these provisions are present in every form of the Defendant's Service Contracts.

93. Collectively, the provisions described in Paragraphs 82 to 88 illustrate the Defendant's intentional business model to (i) unilaterally decide what services were needed at any particular job and whether or when to perform them, (ii) refuse to provide any estimates in advance of beginning its services, (iii) calculate the prices for those services under a closed-book arrangement that concealed those amounts from its customers and their insurers while the services were performed, and (iv) only provide its invoices at the conclusion of its work.

94. The significance of these provisions is described in Section IX(A)-(F) *infra*.

95. In addition, a great majority of the Services Contracts that represent Digital Transactions included Signature Certificates that show specific dates and times when the customer allegedly first "viewed" and then later allegedly "signed" the contract.

///

96. In 39 of the 43 Signature Certificates present in the Defendant's Documents, the Service Contract was allegedly signed in less than 13 minutes after the customer first viewed the contract.

97. In fact, 28 of the Signature Certificates show the related Services Contract was allegedly signed in less than 7 minutes after the customer first viewed the contract.

98. From the Defendant's Documents, the shortest time between a customer viewing and allegedly signing a contract was 2 minutes and 10 seconds.

99. From the Defendant's Documents, the Signature Certificates present for 3 of the 43 Services Contracts show the contracts were allegedly signed between 13 and 29 minutes after the customer first viewed the contract.

100. From the Defendant's Documents, the longest time shown by a Signature Certificate between a customer viewing and allegedly signing a contract was 4 hours and 16 minutes.

101. Considering (i) the consistent form of all Services Contracts being signed or initialed after the recitals on page one, (ii) the identity in form and placement of all subsequent initials or signatures throughout the Services Contracts which represent Digital Transactions, and (iii) the consistent form of nearly all Services Contracts by beginning the Contractual Terms on page 2, the brief amounts of time between which the Defendant's customers viewed and allegedly signed their contracts strongly suggests these customers only signed the recitals, and were not aware they had allegedly signed a longer form of Services Contract.

### B. <u>What the Defendants' Operating Agreement and Resolutions Clearly State</u>

102. The Defendant's Operating Agreement anticipates one manager that controls its day-to-day business operations, but also provides that manager the authority to appoint specific officers and delegate certain authority, power and discretion to those officers.[13]

[13] The Operating Agreement is on file in this docket at ECF 112, Ex. F.

103. Specifically, Section 7.1 of the Operating Agreement grants the manager's authority to control day-to-day operations, and Section 7.10 vests that manager with the authority to appoint officers and delegate certain authority, power and discretion to such officers.

104. The Debtor's representative Eduardo Arredondo has confirmed he was the manager described in Section 7.1 of the Operating Agreement, and had served as the only manager of the Defendant from 2008 until the Defendant's filing of a petition for bankruptcy.

105. Mr. Arredondo has also confirmed that he never appointed any other officers as permitted in Section 7.10 of the operating agreement.

106. In addition, Section 7.3 of the Defendant's Operating Agreement provides that no manager shall cause or permit the company to expend more than $25,000 of company funds in a single transaction, or incur company debt in excess of $25,000 without the written approval of members holding a specific majority of the company's voting units.

107. However, the Defendant's Documents contained no written resolutions or other written approval from members holding the requisite majority of the company's voting units to either expend more than $25,000 of company funds in a single transaction, or to incur company debt in excess of $25,000.

108. The Defendant's Documents also include minutes from a December 20, 2007 first meeting of members ("First Meeting Minutes").[14]

109. Section XXXX of the Frist Meeting Minutes addresses Major Contracts, and provides that the Defendant's Manager may enter into major contracts only upon authorization from the Defendant's members at a special meeting called for that purpose, if the members deem such contract to be in the company's best interests.

110. The First Meeting Minutes do not define what constitutes a "Major Contract" but the provisions in Section 7.3 of the Operating Agreement, described in

[14] The First Meeting Minutes are on file in this docket as ECF 112, Ex. D.

paragraph 106 *supra*, requires written approval from the majority of the Debtor's members to (i) expend more than $25,000 of Debtor's funds in a single transaction, or (ii) incur debt in excess of $25,000.

111. In addition, Section XXI of the First Meeting Minutes provides that the filing of lawsuits can only be authorized by the Defendant's members at a special meeting.

112. Further, Section XXXXVIII of the First Meeting Minutes provides that prior resolutions can only be rescinded upon a special meeting of the Debtor's members.

113. The Defendant's Documents do not include any subsequent resolutions or minutes from special meetings that rescinded Section XXI or Section XXXX of the First Meeting Minutes.

114. Finally, the Defendant's Documents include a series of Minutes of Annual Meetings of Members, all signed by Eduardo Arredondo as Manager.

115. These minutes from annual meetings routinely had one item of business, which was to generally approve actions of the Manager from the previous year.

116. These minutes from annual meetings include a single resolution by which the Manager's known acts from the previous year were ratified and approved.

117. However, none of these minutes from annual meetings of members discuss or approve any actions taken by any individuals other than the Manager, Eduardo Arredondo.

**C. <u>What the Defendants' Liens and Supporting Documents Clearly State</u>**

118. Nev. Rev. Stat. § 108.2214 defines a "lien claimant" as any "person who provides work, material or equipment with a value of $500 or more to be used in or for the construction, alteration or repair of any improvement, property or work of improvement."

119. Nev. Rev. Stat. § 108.222 generally provides that a lien claimant has a lien upon the property, or any improvements for which the work, materials and equipment were furnished or to be furnished.

120. The amount of such lien can be determined in two ways.

121. If the parties agreed, by contract or otherwise, upon a specific price or method for determining a specific price for some or all of the work, material and equipment furnished by or through the lien claimant, then Nev. Rev. Stat. § 108.222(1)(a) provides that the lien amount is the unpaid balance of the price agreed upon for such work, material or equipment, as the case may be.

122. If the parties did not agree, by contract or otherwise, upon a specific price or method for determining a specific price for some or all of the work, material and equipment furnished by or through the lien claimant, Nev. Rev. Stat. § 108.222(1)(b) provides that the lien amount is an amount equal to the fair market value of such work, material or equipment, as the case may be, including a reasonable allowance for overhead and a profit.

123. In the Defendant's Documents, all of the Defendant's liens state a specific amount as the "amount of the original contract," and thus appear to be based on Nev. Rev. Stat. § 108.222(1)(a).

124. Yet, as described in paragraphs 84 through 87, *supra*, none of the Services Contracts stated a specific price or any method for determining a specific price.

125. Thus, on the front end the Defendant intentionally told its customers that price could not be determined or even estimated in advance, and on the back end Defendant intentionally filed notices of mechanic's liens which all claimed a specific amount as the amount of the original contract.

126. The Defendant's Documents show that the amounts in its mechanic's liens are not calculated based on Nev. Rev. Stat. § 108.222(1)(b), because every lien in the Defendant's Documents has a corresponding bill summary.

127. In turn, those bill summaries are based on various invoices issued by the Defendant after allegedly completing its work.

///

///

128. Within the Defendant's Documents, the various invoices that support the bill summaries often include charges by Defendant of "overhead and profit" for services provided by subcontractors and other third-parties.

129. In other cases, the Defendant's Documents show a bill from a subcontractor for a particular service, such as asbestos abatement, at a particular residence, and then a subsequent bill from the Defendant to its customer for the same service but at a significantly inflated price.

130. The amounts in the Defendant's bill summaries, which are consistent with the amounts in the recorded notices of lien, are all based on the higher amounts shown in the Defendant's bills to its customers rather than the lower amounts shown on bills from the subcontractor to the Defendant.

131. In many instances, these bill summaries also show charges for pack-in/pack-out or content manipulation services, i.e., moving around furniture and personal property, the amounts of which often constitute a significant portion of the total lien amount.

132. In addition, the Defendant's Documents include correspondence regarding a former customer whereby the Defendant's manager stated that Defendant typically negotiated significant discounts to its invoices, in amounts that were thousands of dollars; not merely a few hundred dollars.

133. Defendant intentionally did not provide its invoices until after completing its work. If the Defendant's lien amounts were based on fair market value, there would be no legitimate reason to typically discount them by thousands of dollars.

134. Thus, the amounts of all the Defendant's liens are based on the final invoices described in Section 2(a) of the Service Contracts, which were purposely calculated under a "closed-book arrangement" described in Section 2(b) of the Service Contracts and thus intentionally hid the cost of labor and materials from both the customer and any insurance company until the Defendant allegedly completed its work.

///

135. Finally, the Defendant's Documents included 60 recorded Notices of Lien, corrected Notices of Lien or Notices of Amended Lien.

136. Of those 60 lien documents, only 14 were signed by the Defendant's Manager, Eduardo Arredondo.

137. All the other liens were signed by Defendant's employees, such as Bianca Ames, Myoni Maymon and Derek Anderson.

138. The Defendant's Documents have no documents that establish any authority of Bianca Ames, Myoni Maymon or Derek Anderson to act behalf of the Defendant, and the various Minutes of Annual Meetings of Members described in paragraphs 114-117, *supra*, contain no resolutions approving or even considering the acts of Bianca Ames, Myoni Maymon or Derek Anderson.

139. In addition, at the State's Rule 2004 examination, Mr. Arredondo confirmed that Bianca Ames is his mother.

140. Defendant's Documents show that 42 of 60 recorded liens were signed by Mr. Arredondo's mother.

### D. <u>What the Defendant's' Permit Cancellations Clearly Show</u>

141. While the Service Contracts include recitals that speak of restoration,[15] the Defendant's correspondence with local building departments show Defendant had no intention of providing restoration services.

142. The State contacted the local building departments in each of (i) Clark County, (ii) the City of Las Vegas, (iii) the City of North Las Vegas, and (iv) the City of Henderson, and requested copies of all building permits issued to Defendant, and all requests to cancel permits received from the Defendant, or information showing the same, for the period of July 1, 2018 to April 1, 2021.

///

---

[15] The second Recital in all Services Contracts includes language whereby each customer authorized the Defendant to "bring the property into as near its pre-loss condition as possible," which was part of the defined Scope of services.

143. Collectively, the documents and information received by the State show that the Defendant obtained 238 building permits during that time, of which 218 were intentionally cancelled, on the date of the Defendant's cancellation request, or allowed to expire the day after the deadline had passed for obtaining a final inspection.[16]

144. Thus, in about 92% of those projects, the Service Contracts and building permits offered only a pretense of restoration.

## VII. RELEVANT FACTS AND OMISSIONS EVIDENT FROM WHAT THE DEFENDANT'S DOCUMENTS AND TESTIMONTY DO NOT, OR REFUSE TO, SAY

145. While the Defendants' Documents speak for themselves in many ways, equally important is what the Defendant's Documents do not say, and what Mr. Arredondo refused to say at his examination.

### A. The Service Contracts Lack Several Disclosures Required Under State and Federal Law

146. The Defendant's Documents illustrate that the various Service Contracts are the result of "Door-to-door sales" as defined in Nev. Rev. Stat. § 598.180.

147. For example, one of the Defendant's Documents is a July 27, 2020 letter signed by Mr. Arredondo which discusses the Defendant's former customers Judith and Tony Del Rial (the "Del Rial Letter").

148. The Del Rial Letter describes a sequence of events whereby the customer contacted Defendant's commonly-owned affiliate Rooter Man early one morning. Later that same morning, a Rooter Man employee came to the customer's home, and during that visit referred the customer to the Defendant for water loss restoration services.

149. In the Del Rial Letter, Mr. Arredondo further stated that on behalf of the Defendant, he came to the customer's home later that same day, presented the

---

[16] Copies of 154 of the Defendant's permit cancellation requests are on file in this docket as ECF 112, Ex. G. Since the date of that filing, the State obtained information regarding 70 additional residential building permits issued by the City of Henderson during that time, 67 of which were affirmatively cancelled or allowed to expire. And, the remaining 3 permits which received a "final inspection" were for plumbing work only.

Defendant's standard form of contract to the customer, and the Defendant began some of its services later that day; the same day the customer first contacted Rooter Man.

150. Depending on the time of day a customer first contacted Rooter Man, the Defendant or its agents presented the Defendant's Service Contract to the customer that same day, and would commence services later that same day or the following day.

151. The Del Rial Letter is consistent with information the State received from numerous former customers of the Defendant during the State's pre-petition investigation, and the Defendant's Documents have no documents that show or even suggest its Service Contracts did not arise from Door-to-door sales.

152. When a buyer enters into a contract for services that results from a Door-to-door sale, Nev. Rev. Stat. § 598.240 requires that contract to contain a statement in bold type in immediate proximity to the space reserved in the contract for the signature of the buyer, which statement must substantially be in the following form:

> **You, the buyer, may cancel this transaction at any time prior to midnight of the third business day after the date of this transaction. See the attached notice of cancellation form for explanation of this right.**

153. In addition, Nev. Rev. Stat. § 598.250 requires that a seller in a Door-to-door sale must furnish the buyer with a fully completed form in duplicate, captioned "NOTICE OF CANCELLATION," which must be attached to the contract and easily detachable, and which must contain in boldface type specific information further delineated in Nev. Rev. Stat. § 598.250, in the same language as that used in the contract.

154. Among other things, the Notice of Cancellation form required by Nev. Rev. Stat. § 598.250 must notify the buyer that it has 3 business days to cancel the transaction without any penalty or obligation.

155. This requirement is consistent with the policy of protecting consumers from high pressure sales tactics of door-to-door solicitors.

///

///

156. However, despite these requirements, none of the Service Contracts include the prominent notice of buyer's right of cancellation required by Nev. Rev. Stat. § 598.240, or the Notice of Cancellation form required by Nev. Rev. Stat. § 598.250.

157. These omissions were intentional, as evidenced by the Defendant's use of form contracts, and the Defendant or its agent presenting the Service Contracts to the customers in all cases.

158. In addition, the Defendant's Documents illustrate that a great majority of its Service Contracts represent Digital Transactions.[17]

159. These particular contracts are "electronic records" as defined by Nev. Rev. Stat. § 719.090, and the signatures thereon are "electronic signatures" as defined by Nev. Rev. Stat. § 719.100.

160. When a natural person acquires services that are used for primarily personal, family or household purposes, Nev. Rev. Stat. § 719.210(2) requires that transaction to comply with section 101(c) of the Electronic Signatures in Global and National Commerce Act, 15. U.S.C. §§ 7001, et seq. ("E-Signatures Act").

161. In turn, the E-Signatures Act provides that electronic records can be the basis for a written contract if (i) the consumer affirmatively consents to use of the electronic record, and (ii) prior to consenting, the consumer is provided a clear and conspicuous statement with several disclosures.[18]

---

[17] See ¶ 78, *supra*.

[18] 15 U.S.C. § 7001(c). Specifically, the clear and conspicuous statement must (a) inform the consumer of (i) any right or option of the consumer to have the record provided in nonelectronic form, and (ii) the right of the consumer to withdraw the consent to have the record provided in electronic form and of any conditions, consequences, or fees in the event of such withdrawal; (b) inform the consumer of whether the consent applies (i) only to the particular transaction which gave rise to the obligation to provide the record, or (ii) to identify categories of records that may be provided or made available during the course of the parties' relationship; (c) describe the procedures the consumer must use to withdraw consent as provided in clause (a) and to update information needed to contact the consumer electronically; and (d) informing the consumer (i) how, after the consent, the consumer may, upon request, obtain a paper copy of an electronic record, and (ii) whether any fee will be charged for such copy.

162. None of the Service Contracts which represent Digital Transactions, or any of the other Defendant's Documents, include the disclosures required by the E-Signatures Act and Nev. Rev. Stat. § 719.210(2).

163. These omissions were intentional, as evidenced by the Defendant's use of form contracts, and the Defendant or its agent presenting the Service Contracts to the customers in all cases.

### B. The Service Contracts are not Enforceable Because They Lack Essential Terms

164. As alleged previously, the provisions in Sections 2(a) and Section 2(b) of the Service Contracts clearly show that all Service Contracts (i) lack any price, or readily ascertainable method to determine the price, for Defendant's services, and (ii) provided the Defendant complete discretion over its performance.

165. Aside from the Defendant's complete discretion about its performance, the illusory nature of the Defendant's alleged promises to perform is further evidenced by the complete lack, in all of the Service Contracts, of any requirement that its customers provide a down payment or provide or consent to a credit rating check.

166. Mr. Arredondo has stated that Defendant was in business for about 12 years prior to its bankruptcy petition, and performed about 365 jobs per year.

167. Mr. Arredondo has also confirmed the Defendant's deliberate decision to submit the Defendant's invoices to an insurance company only after the Defendant's work was complete.

168. By submitting its invoices to insurance only after completing its work, as opposed to seeking approval before doing the work, Defendant bore some risk that some of its services, or amounts charged for its services, would not be approved for payment.

169. The premise that any service provider, and particularly one who has performed thousands of jobs and has deliberately taken the risk that an insurance company may not approve payment for its services, would then commit to perform services allegedly worth tens of thousands of dollars, and in some cases allegedly worth

more than One Hundred Thousand dollars, without any requirement of a down payment or credit rating check is truly incredible.

170. Because all the Service Contracts lack any price, or ascertainable method to determine a price, and contain only illusory promises by the Defendant, none of them have the essential terms necessary to be an enforceable agreement.

### C. Where Applicable, the Recorded Liens do not Distinguish Between Lienable and Significant Non-Lienable Amounts

171. The Defendant's Documents include bill summaries that correspond to its various recorded liens.

172. These bill summaries list the alleged "contract amounts," payments received by Defendant from a customer or its insurance company, and the Defendant's resulting "lien amounts."

173. In the bill summaries, both the contract amounts and lien amounts are broken down into specific charges for various categories of service, such as water mitigation, mold remediation, asbestos abatement, pack in, pack out, content out, living expenses and other services.

174. Thus, the bill summaries illustrate that Defendant had the information necessary to distinguish the amounts of certain categories of its services.

175. Among the Defendant's Documents, many of the bill summaries included amounts for pack-in, pack-out, content out, living expenses or other non-lienable expenses.[19]

176. The expenses described in paragraph 175 are non-lienable because they did not improve the customer's property.

///

---

[19] See, e.g., the Complaint on record in Case No. A-19-805-131-C, *CAT Detailing, LLC vs. Vernon Reeves*, filed on November 8, 2019 in the District Court for Clark County, Nevada. Paragraph 7 claims a balance of $70,975.91. Of that amount, $16,275.09 is for pack in services and pack out services. Thus, at least 22.9% of the lienable amount claimed is for non-lienable services.

177. Even the Defendant's Services Contracts recognize any homeowner can do its own content-in/content-out/pack-in/pack-out services; they do not require the knowledge or expertise of a professional contractor.

178. In more than half of the bill summaries that include non-lienable services, the amount of non-lienable expenses represented more than 10% of the total claimed lien amount.

179. Even in cases where the non-lienable expenses were less than 10% of the total lien expenses, the Defendant's total lien amount included thousands of dollars for non-lienable work.

180. In other cases, the amounts charged by third-parties for lienable services such as asbestos abatement were then significantly marked-up when the Defendant charged its customers for those same services.

181. The Defendant's Documents do not include any documents explaining or justifying these mark-ups.

182. An arbitrary mark-up of amounts charged by a third-party does not improve the customer's property, but the corresponding Notices of Lien recorded by the Defendant in these cases allege a total lien amount that includes the arbitrary mark-ups for third party services.

183. Defendant had the ability to distinguish amounts of certain categories of work, and categories of costs, but instead recorded liens that failed to distinguish among lienable and non-lienable amounts, which reflects Defendant's intentional use of the statutory lien process to obtain payments for non-lienable amounts.

**D. <u>All Service Contracts in the Alleged Amount of $25,000 Were Never Properly Authorized</u>**

184. The Defendant's Documents included contracts for 55 of its former customers.

185. In 28 of 55 cases, the Defendant's Documents alleged the value of the original contract was more than $25,000.

186. However, the Defendant's First Meeting Minutes provide that the Defendant's Manager could only enter into "Major Contracts" upon authorization from the Defendant's members at a special meeting called for that purpose.

187. The Defendant's Operating Agreement indicates that "Major Contracts" include any contract by which the Defendant would expend more than $25,000 in a single transaction, or incur debt in excess of $25,000.

188. Yet, the Defendant's Documents do not include any minutes from any special meeting of members authorizing contracts in amounts exceeding $25,000.

189. Accordingly, Defendant has intentionally sought to enforce contracts that were never properly authorized.

190. All contracts whose original amount allegedly exceeded $25,000 were never properly authorized and are thus voidable.

### E. <u>None of the Defendant's Lawsuits Against its Customers Were Properly Authorized</u>

191. Similarly, the Defendant's First Meeting Minutes provide that the filing of lawsuits can only be authorized by the Defendant's members at a special meeting.

192. Yet, the Defendant's Documents do not include any minutes from any special meeting of members authorizing the filing of any lawsuits.

193. Accordingly, all pending causes of action listed on Part 11 of Schedule A/B represent unauthorized acts of the Defendant.

### F. <u>Additional Topics for Which Mr. Arredondo Refused to Testify</u>

194. As for Mr. Arredondo's testimony, during the January 13, 2022 examination, the State presented nearly sixty of the Defendants' Documents to Mr. Arredondo and asked questions about them, and in several instances, Mr. Arredondo responded by invoking his rights under the U.S. Constitution and Nevada Constitution against self-incrimination.

195. In such cases, and upon stipulation between the State's counsel and Mr. Arredondo' personal counsel, Mr. Arredondo generally replied with "take the 5th."

196. When a civil litigant invokes his Fifth Amendment right to remain silent in the face of evidence against him, a Bankruptcy Court may draw adverse inferences from such answers to the specific questions the witness refused to answer. *Wedell v. Landis*, 551 B.R. 74, 80 (D. Nev. 2016).

197. And, the adverse inferences drawn from such answers may serve as circumstantial evidence. *Id*. at 81.

198. After being presented with copies of the corresponding Defendant's Documents, relevant topics on which Mr. Arredondo chose to "take the 5th" when responding to questions by the State included the following:[20]

a) The State presented a contract between one of Defendant's customers and the Defendant's commonly-owned affiliate Rooter Man, which contract listed a specific price for services. When the State asked Mr. Arredondo why the Rooter Man contract could list a specific price, but none of the Defendant's contracts could list a specific price or price estimate, Mr. Arredondo invoked his rights under the 5th;

b) After recalling Mr. Arredondo's statements that the Defendant had been in business since 2009 and performed about 365 days per year, the State asked why the Defendant was unable to provide any specific prices or price estimates in its contracts despite its long history, and Mr. Arredondo invoked his rights under the 5th;

c) In four separate cases, the State presented a recorded notice of lien that was signed by Bianca Ames, Myoni Maymon or Derek Anderson, and in each case the State asked what authority these individuals had to sign these lien documents on behalf of the Defendant, and in every case Mr. Arredondo invoked his rights under the 5th;

---

[20] As stated in n. 8, *supra*, the State includes select alleged testimonial statements of Mr. Arredondo in this Complaint to demonstrate the State has a good faith basis to seek its requested relief.

d) Referencing the Del Rial Letter, the State asked whether the sequence of events described in paragraphs 148 – 149 *supra* represented the normal sequence of events for Defendant's initial contact with customers, and Mr. Arredondo invoked his rights under the 5th;

e) The State then asked Mr. Arredondo if he could recall any specific situations where Defendant's initial contact with customers was different from the experience described in the Del Rial Letter, and Mr. Arredondo invoked his rights under the 5th;

f) After reviewing a series of invoices issued by various third-parties for hotel expenses and guard services, and comparing the amounts of those invoices to the amounts charged by Defendant to its customer for the same services, the State asked Mr. Arredondo if he could think of any reason why the Defendant's charges to its customers for such services was higher than the amounts on the invoices provided by the third-parties, and Mr. Arredondo invoked his rights under the 5th;

g) After reviewing a series of the Defendant's invoices that showed Defendant had charged its customer overhead and profit on services that were provided by third-parties, the State asked why Defendant charged overhead and profit on third-party services, and Mr. Arredondo invoked his rights under the 5th;

h) When the State asked if the Defendant always charged overhead and profits for services that were provided by third parties, Mr. Arredondo invoked his rights under the 5th;

i) After reviewing correspondence in which one of the Defendant's employees refused to provide an insurance company with timesheets for the Defendant's technicians, the State asked if it was standard practice for Defendant to refuse to provide an insurance company with time sheets for its technicians, and Mr. Arredondo invoked his rights under the 5th;

j) Focusing specifically on situations where Defendant would not provide timesheets for its technicians, the State asked if Defendant would provide the insurance company with any way to verify the actual number of hours claimed to have been worked by its technicians, and Mr. Arredondo invoked his rights under the 5th;

k) After reviewing correspondence between a claims adjuster and one of the Defendant's employees, wherein the claims adjuster objected to specific charges by the Defendant, the State reviewed statements by the claims adjuster alleging that the Defendant's prices for supervision were 25% higher than the normal market prices shown in Xactimate, after which the State asked what the Defendant's basis would be for a 25 percent increase on that service, and Mr. Arredondo invoked his rights under the 5th;

l) The State then asked Mr. Arredondo if he knew whether the prices on Defendant's invoices were often higher than the market prices in Xactimate, and Mr. Arredondo invoked his rights under the 5th;

m) After reviewing correspondence between a claims adjuster and one of the Defendant's employees, wherein Defendant agreed to some reductions of its billing in response to alleged errors observed by the claims adjuster, the State asked why any reductions would be needed if Defendant's bills were based on work it had already performed, and Mr. Arredondo invoked his rights under the 5th;

n) The State asked if Mr. Arredondo could think of any reason the Defendant's bills would have errors when Defendant only provided its bills after completing its work, and Mr. Arredondo invoked his rights under the 5th;

o) The State reviewed a series of statements written by Mr. Arredondo, which included a statement that Mr. Arredondo did not amend liens once they were sent to Defendant's collection attorney. When the State asked whether the Defendant would not amend a lien to a lower amount even if it received

payment from an insurance company or homeowner after the lien had been filed, Mr. Arredondo invoked his rights under the 5th;

p) Referring specifically to cases where the Defendant did not amend a lien to a lower amount, the State asked if that refusal was an attempt to place pressure on the homeowner to pay more money, and Mr. Arredondo invoked his rights under the 5th;

q) When the State asked if Mr. Arredondo remembered any customers complaining to Defendant that they had submitted payment after a lien was recorded, but the Defendant did not amend the lien, Mr. Arredondo invoked his rights under the 5th;

r) After reviewing another written statement by Mr. Arredondo about the addition of collection fees, the State asked Mr. Arredondo if he considered attorney's fees or collection fees to be part of the lien amount covered by the Defendant's mechanic's lien, and Mr. Arredondo invoked his rights under the 5th;

s) The State reviewed three separate sets of invoices where a subcontractor allegedly performed asbestos abatement for three different customers, and in each case the invoices from the subcontractor to the Defendant charged amounts that were significantly less than the amounts later charged by Defendant to each customer for asbestos abatement. After reviewing each set of invoices, from the subcontractor to Defendant and the Defendant to the customer (the "Asbestos Abatement invoices"), the State asked why the amount of the invoice issued by Defendant for asbestos abatement was significantly higher than the amount of the invoice issued by the subcontractor who had performed asbestos abatement, and in all three cases Mr. Arredondo invoked his rights under the 5th;

t) After reviewing the same Asbestos Abatement invoices, the State asked whether the difference in prices charged by the subcontractor to Defendant,

compared to the prices charged by Defendant to it customers, represented Defendant's overhead and profit, and in all three cases Mr. Arredondo invoked his rights under the 5th;

u) After reviewing the same Asbestos Abatement invoices, the State asked whether the Defendant did any additional asbestos abatement at these homes that would be valued in the amount equal to the difference in prices charged by the subcontractor to Defendant, compared to the prices charged by Defendant to its customers, and in all three cases Mr. Arredondo invoked his rights under the 5th.

199. Accordingly, at the appropriate time and subject to the requirements of LR 7032, this Court may draw negative inferences from the refusal to answer these specific questions, and those adverse inferences may be considered circumstantial evidence of the State's claims herein.

## VIII. OBJECTIVE INFORMATION FROM RELIABLE THIRD-PARTIES

200. In addition to the Defendant's permit cancellations described in Section VI(D) *supra*, the State has objective information from additional sources that confirm the true nature of Defendant's business.

201. The National Insurance Crime Bureau ("NICB") was formed in 1992, and is a non-profit organization that partners with insurance companies, consumers and law enforcement to combat insurance fraud.[21]

202. In Nevada, Nev. Rev. Stat. § 686A.215 defines insurance fraud to include (i) presenting a statement that conceals or omits facts, or contains false or misleading information, in support of a claim for payment under a policy of insurance, and (ii) accepting any proceeds under a policy of insurance if the person who accepts the proceeds knows they are derived from any misleading act or omission.

///

///

[21] https://www.nicb.org/about-nicb

203. Nev. Rev. Stat. § 686A.2183 requires that insurers must report any information concerning insurance fraud to the Commissioner of Insurance and the Attorney General.

204. When the insurer is also a member of the NICB, that insurer follows industry practice and also reports the fraud to the NICB.

205. The NICB has provided the State with information about 37 separate questionable claims associated with the Defendant that were referred to the NICB from June 5, 2015 to January 6, 2020.

206. Attached as Exhibit 1 is a table summary of the questionable claims associated with the Defendant that were referred to the NICB, prepared by the State and based on the information provided by the NICB.[22]

207. According to the NICB, these claims about the Defendant were referred to the NICB for various reasons including but not limited to (a) fictitious loss, (b) material misrepresentations, (c) questions of altered, forged or falsified documents, (d) vendor fraud, (e) inflated damage, and (f) inflated billing.

208. In addition, the Nevada State Contractors Board ("NSCB") had an administrative complaint against the Defendant pending at the time of the filing of Defendant's bankruptcy petition.

209. The NSCB's administrative action against the Defendant was resolved in an October 15, 2021 Decision and Order issued by the Honorable Philip Pro (Retired), Administrative Law Judge ("NSCB Order").

210. The NSCB Order concluded that Defendant had engaged in several acts of fraudulent conduct, and thus levied a series of administrative fines against the Defendant.

211. A copy of the NSCB Order is attached as Exhibit 2.

///

[22] The actual report provided by the NICB to the State is not attached because it has been marked as confidential and sensitive throughout.

212. Although this court cannot take notice of the findings of fact in the NSCB Order, it may take judicial notice of the Order's existence and terms pursuant to Fed. R. Evid. 201(b). *Ferris v. Wynn Resorts Ltd.*, 462 F.Supp.3d 1101, 1118 (D. Nev. 2020).

213. Thus, the Defendant's nefarious pattern of conduct is evident by the fact that the Defendant's conduct attracted attention from, and/or action by, the State, local building departments, the NICB and the NSCB.

## IX. CLAIMS SUPPORTING REQUESTED RELIEF

214. Property obtained by fraud of a debtor, or by other tort, is not properly a part of the bankruptcy estate.

215. Whether an asset is estate property is determined by examining the nature of the asset on the date the bankruptcy petition was filed.

216. Thus, with respect to the Defendant's causes of action, any underlying contracts or liens that were grounded in fraud or were otherwise invalid under Nevada law on April 12, 2021 remain grounded in fraud or otherwise invalid today.

217. Even a judgment is void if the underlying claims arise from fraud or violation of public policy, because fraud vitiates anything it touches.

218. Intent to defraud can be inferred from circumstantial evidence.

219. Based on the allegations herein, the pending causes of action listed on Part 11 of Schedule A/B are not legitimate assets of the bankruptcy estate.

220. As described in subsections (a) and (b) below, all Service Contracts were and remain unenforceable.

221. As described in subsections (c), (e) and (j) below, all Service Contracts were and remain fraudulent and void.

222. As described in subsections (d), (e) and (j) below, all Service Contracts representing Digital Transactions were and remain fraudulent and void.

223. As described in subsection (f) below, all Service Contracts whose alleged amount exceeds $25,000 were and remain unauthorized, and incapable of ratification because they were secured by the Defendant's misrepresentations.

224. As described in subsection (g) below, a majority of the Defendant's recorded notices of lien were and remain unauthorized and invalid.

225. As described in subsection (h) below, all of the Defendant's recorded notices of lien were never, and cannot now be, properly perfected, and thus were and remain invalid.

226. As described in subsection (i) below, certain of the Defendant's recorded notices of lien were and remain defeated because they claim total amounts that include significant non-lienable amounts, but failed to distinguish between lienable and non-lienable amounts.

227. As described in subsection (k) below, all of the Defendant's pending causes of action were and remain unauthorized and incapable of ratification.

228. As described in subsection (l) below, all of the Defendant's recorded mechanic's liens and related causes of action reflect an abuse of process of Nevada's mechanic's lien laws.

### A. All Service Contracts Lack Essential Terms and are Thus Unenforceable

229. The State re-alleges the facts above and incorporates them herein by reference.

230. None of the Service Contracts contain any specific prices for the services to be performed, nor any manner from which a price could be readily ascertained.

231. The Defendant intentionally hid its prices from both customers and their insurance companies until Defendant had completed services, and also concealed the methodology for its prices by calculating them under a closed-book arrangement.

232. In addition, all Service Contracts provided the Defendant the unlimited right to decide the timing, nature and extent of its performance.

233. Accordingly, none of the Service Contracts are enforceable under Nevada law. They are at best illusory promises that impose no legal obligations.

///

**B. <u>All Service Contracts Were Signed Under Duress and are Thus Unenforceable</u>**

234. The State re-alleges the facts above and incorporates them herein by reference.

235. All Service Contracts contain repeated references to emergency circumstances.

236. All Service Contracts are the result of Door-to-door sales.

237. Nevada law has provisions designed to provide a cooling off period for customers that enter into Door-to-door transactions, but Defendant thwarted those provisions by routinely beginning to perform services the same day as, or within 24 hours of, the alleged signing of Service Contracts.

238. For Service Contracts representing Digital Transactions, the Defendant's Documents show that its customers allegedly signed the contract within minutes of viewing it.

239. Altogether, these factors demonstrate that the contracts are unenforceable because, if signed at all, they were signed under duress.

**C. <u>All Service Contracts are Fraudulent Because they Intentionally Omit Disclosures Required under State and Federal Law</u>**

240. The State re-alleges the facts above and incorporates them herein by reference.

241. All Service Contracts arise from Door-to-door sales by the Defendant or its agents.

242. But, none of the Service Contracts include the prominent notice of buyer's right of cancellation required by Nev. Rev. Stat. § 598.240, or the Notice of Cancellation form required by Nev. Rev. Stat. § 598.250.

243. In addition, the Service Contracts that represent Digital Transactions are "electronic records" as defined by Nev. Rev. Stat. § 719.090, and the signatures thereon are "electronic signatures" as defined by Nev. Rev. Stat. § 719.100.

244. However, as described in Section VII(A) *supra*, none of the Service Contracts which represent Digital Transactions, or any of the other Defendant's Documents, include the disclosures required by the E-Signatures Act and Nev. Rev. Stat. § 719.210(2).

245. Thus, every Service Contract reflects the Defendant's intent to conceal material rights from each of its consumers on the dates they allegedly signed these contracts.

246. Because all Service Contracts intentionally conceal material rights from each customer, they are fraudulent under Nevada law.

**D. <u>All Service Contracts Representing Digital Transactions are Fraudulent Because Their Signatures were Induced by Fraud</u>**

247. The State re-alleges the facts above and incorporates them herein by reference.

248. All Service Contracts are signed by the customer following the Recitals on page 1, but with few exceptions, the Terms of Agreement do not begin until Page 2.

249. The Recitals on page 1 contain general authorizations, but the Recitals alone are not an enforceable contract.

250. A signature of the Recitals only would not create any legal obligations.

251. In the case of Digital Transactions, the customer's alleged signature or initials following the Recitals was then auto-populated throughout the remainder of the Services Contract, as evidenced by their identical form and placement on each subsequent page.

252. Thus, the Defendant asked its customers to sign the Recitals on page 1 so Defendant could then use that signature to auto-fill all other customer signatures throughout the alleged agreement.

253. Even the Defendant's Documents infer that these customers never actually reviewed, or had an opportunity to review, the entire contract because various Signature Certificates show mere minutes between the date and times such contract was first viewed and allegedly signed by the customer.

254. Accordingly, the signatures on all Service Contracts representing Digital Transactions were induced by the Defendant's fraud on the dates and times shown in the Signature Certificates.

**E. Because they are Fraudulent, all Service Contracts are *Ultra Vires* Acts and thus Void**

255. The State re-alleges the facts above and incorporates them herein by reference.

256. Defendant is a Nevada limited liability company.

257. Fraudulent acts of a Nevada LLC are *ultra vires* acts and are thus void. They cannot be ratified.

258. As described in Counts IX(C) and (D) above, all Service Contracts are the result of Defendant's fraud and are thus void as *ultra vires* acts of the Defendant.

F. **All Service Contracts Whose Alleged Amount Exceeds $25,000 are Voidable**

259. The State re-alleges the facts above and incorporates them herein by reference.

260. Read together with the Defendant's Operating Agreement, the Defendant's First Meeting Minutes required all contracts that expend more than $25,000, or that incur debt of more than $25,000, could only be entered into upon authorization from the Defendant's members at a meeting called for that purpose, if the members deemed such contract to be in the Defendant's best interests.

261. The Defendant's Documents, including the various recorded Notices of Liens and the Defendant's corresponding bill summaries, allege many of its Service Contracts were in "original amounts" of more than $25,000.

262. However, none of the Defendant's Documents have any resolutions from special meetings of members that authorize any of these contracts.

263. Thus, all such contracts were unauthorized at the time they were allegedly signed.

264. Because all such contracts were secured by the Defendant's misrepresentations, they could not be ratified later.

265. Unauthorized contracts that are not subsequently and properly ratified are invalid under Nevada law.

### G. **<u>All Recorded Notices of Lien Signed by Anyone other than Eduardo Arredondo are Unenforceable</u>**

266. The State re-alleges the facts above and incorporates them herein by reference.

267. The Defendant's representative, Mr. Arredondo, confirmed that he has been the only person since 2008 that had authority to act on behalf of the Defendant.

268. Mr. Arredondo has also stated he served as the only Manager of the company, and that he never appointed any other Officers pursuant to Section 7.10 of the Operating Agreement.

269. However, in the Defendant's Documents, less than 25% of the Defendant's recorded notices of lien or amended lien documents were signed by Mr. Arredondo.

270. All other recorded liens in the Defendant's Documents were signed by various employees, and 70% of the recorded liens were signed by Mr. Arredondo's mother.

271. The Defendant's Documents did not have any resolutions by managers or members that considered or approved any acts by Mr. Arredondo's mother, or other employees.

272. Thus, all recorded liens signed by anyone other than Mr. Arredondo represent unauthorized acts of the Defendant, and it is impossible for Defendant to now ratify them in a manner that would properly perfect such liens, because Nev. Rev. Stat. § 108.226 requires mechanic's liens to be perfected within 90 days of the Defendant's completion of works of improvement.

273. Accordingly, all recorded liens signed by anyone other than Mr. Arredondo are invalid under Nevada law.

///

### H. <u>All Recorded Notices of Lien were not, and cannot now be, Properly Perfected</u>

274. The State re-alleges the facts above and incorporates them herein by reference.

275. Nev. Rev. Stat. § 108.222(1)(a) provides that a lien claimant has a lien for the unpaid balance of the price agreed upon for its work, if the parties agreed by contract or otherwise upon a specific price or method for determining a specific price for the lien claimant's work.

276. In the Defendant's Documents, all of the Defendant's liens state a specific amount as the "amount of the original contract," and thus are based on Nev. Rev. Stat. § 108.222(1)(a).

277. Yet, as described in Sections VI(A) and VII(B) *supra*, none of the Services Contracts stated a specific price or any method for determining a specific price.

278. Nor do the Service Contracts have any transparent methodology to determine a specific price, as all the Service Contracts expressly state that Defendant would calculate prices under a closed-book arrangement.

279. Despite telling its customers on the front end that price could not be determined or even estimated in advance, on the back end the Defendant's recorded liens that all claimed a specific amount as the amount of the original contract.

280. Assuming *arguendo* that the "amount of the original contract" listed in all of the Defendant's liens are alleged to reflect the fair market value of the Defendant's work, as permitted by Nev. Rev. Stat. § 108.222(1)(b), the Defendant's causes of action disprove that allegation because all causes of action concurrently assert claims for (i) breach of contract, and (ii) enforcement of lien.

281. In addition, the premise that the Defendant's liens reflect the fair market value of Defendant's work is directly contradicted by Mr. Arredondo's express statement that the Defendant typically negotiated discounts of thousands of dollars to its invoices.

///

282. Considering the Defendant did not issue its invoices until after work was complete, the routine practice of discounting its invoices by thousands of dollars illustrates the Defendant's initial charges did not represent the fair market value of its work.

283. The deficiencies in the Defendant's liens as to their compliance with Nev. Rev. Stat. § 108.222(1)(a)-(b) negates their ability to be properly perfected under Nev. Rev. Stat. 108.226, because mechanic's liens must be perfected within 90 days of the completion of the lien claimant's work.

### I. All Recorded Notices of Lien Stating Amounts that Include Significant Amounts for Non-Lienable Services are Void

284. The State re-alleges the facts above and incorporates them herein by reference.

285. While the amounts in the Defendant's liens are not broken down by category of service, the corresponding bill summaries in the Defendant's Documents provide such a break down.

286. In many cases, the Defendant's bill summaries show that the total lien amount includes charges for non-lienable expenses such as hotel expenses, security guards, pack in, pack out, content in, or content out services.

287. In other cases, the lien amount includes charges for categories of lienable work, such as asbestos abatement, but the Defendant's invoices confirm significant mark-ups by the Defendant to the amounts charged by the subcontractors or third-parties who provided such work.

288. Significant mark-ups with no justification are not lienable expenses, but the Defendant's Documents show the Defendant's lien amounts include these mark-ups, where applicable.

289. When non-lienable expenses comprise a significant portion of the overall lien amount, and the lien claimant fails to distinguish the lienable services from non-lienable services, the lien as a whole is defeated.

290. Accordingly, all of the Defendant's liens that claim lien amounts which include significant amounts for non-lienable services or significant and arbitrary mark-ups are invalid and unenforceable.

**J. <u>As to the Defendant's Customers, the Defendant Engaged in Consumer Fraud</u>**

291. The State re-alleges the facts above and incorporates them herein by reference.

292. Various acts or omissions that constitute deceptive trade practices under Nev. Rev. Stat. §§ 598.015 – 598.025 also constitute acts of consumer fraud under Nev. Rev. Stat. § 41.600(2)(e).

293. As alleged herein, the Defendant intentionally held itself out a restoration company by both its chosen fictitious firm name and the provisions of its contracts.

294. However, the frequency and regularity with which the Defendant intentionally cancelled its building permits, on the date of its cancellation request, or allowed them to expire the day after the Defendant's deadline to obtain a final inspection, illustrate that Defendant had no intention of providing restoration services.

295. By intentionally omitting various disclosures required under state and federal law, all Service Contracts misrepresented the legal rights, obligations or remedies of its customers.

296. In the case of Digital Transactions, the intentional use of a customer's signature following the Recitals to auto-populate all subsequent signatures in the Service Contract constitutes a fraudulent alteration of such contracts.

297. The Defendant's use of coercion or duress, as explained in Count IX(B), was also a deceptive trade practice.

298. Accordingly, with respect to each respective customer, Defendant's intentional conduct arose to multiple acts of consumer fraud pursuant to Nev. Rev. Stat. § 41.600(2)(e) and Nev. Rev. Stat. §§ 598.015(7), 598.0915(14), 5989.092(8), 598.0923(3) and/or 598.0923(4).

**K. The Defendant's Causes of Action Against Former Customers were not Properly Authorized and Should be Dismissed**

299. The State re-alleges the facts above and incorporates them herein by reference.

300. Section XXI of the First Meeting Minutes provides that the filing of lawsuits can only be authorized by the Debtor's members at a special meeting.

301. Yet, the Defendant's Documents do not include any minutes from any special meeting of members authorizing the filing of any lawsuits, whether related to Defendant's liens or otherwise.

302. Accordingly, all causes of action listed in Part 11 of Schedule A/B of the Debtor's Schedules were initiated without the necessary authority.

303. The State has reviewed many of the complaints that commenced these causes of action, and none of them were verified by signature of the Defendant's representative.

304. Because the Debtor's actions are now managed by the Trustee, there is nobody on behalf of Defendant who has the requisite knowledge of all the material facts concerning the filing of these causes of action, which is necessary for ratification, so it is impossible to now ratify these causes of action.

305. Accordingly, all of these causes of action should be dismissed because they were never authorized and cannot now be properly ratified.

**L. The Defendant's Causes of Action Constitute an Abuse of Process of Nevada's Mechanic's Lien Laws**

306. The State re-alleges the facts above and incorporates them herein by reference.

307. An abuse of process exists where a litigant uses legal process to obtain an ulterior purpose other than resolving a legitimate dispute, and the litigant willfully uses that process improperly in the regular conduct of the proceeding.

///

308. The Defendant's Documents and/or testimony of the Defendant's representative show that Defendant routinely filed liens on 30 – 40% of its jobs.

309. Once it filed a lien, the Defendant refused to amend its liens.

310. The Defendant considered collection fees and/or attorney's fees to be part of the Defendant's lienable amounts.

311. The Defendant's Documents and/or testimony of the Defendant's representative show that, in a majority of cases, the Defendant's liens were signed by people who had no authority to act on behalf of the Defendant, and in most cases were signed by Mr. Arredondo's mother.

312. The Defendant's Documents and/or testimony of the Defendant's representative show that Defendant identified specific lien amounts as the "amounts of the original contract" even though none of the Service Contracts stated any specific price, or any methodology to determine a specific price.

313. The Defendant's Documents and/or testimony of the Defendant's representative show that Defendant only provided its invoices to customers or their insurance companies after the Defendant had completed its services.

314. Defendant only had 90 days after completing its work to perfect its liens.

315. By its practice of providing invoices only after its work was complete, Defendant used the 90-day deadline for perfecting liens as a sword to obtain payment for its desired prices from customers and/or their insurance agents.

316. Even though Defendant's lien amounts often included (i) amounts for non-lienable services, or (ii) significant and arbitrary mark-ups on the prices charged by subcontractors that performed lienable services, Defendant's liens never distinguished between lienable and non-lienable amounts.

317. Accordingly, Defendant has used the mechanic's lien statutes to demand payment for non-lienable work or non-lienable charges.

318. The only plausible explanation for why Defendant would allegedly commit to perform services worth tens of thousands of dollars or more, but not require any down

payment or credit rating check from its customers, is that the Defendant intended to use the mechanic's lien process to "secure" payments of any amounts it chose to charge following its closed-book calculation of prices.

319. Altogether, the Defendant's conduct amounts to an abuse of process of Nevada's mechanic's lien laws, and all of the Defendant's liens should be expunged and the related causes of action should be dismissed.

## X. PRAYER FOR RELIEF

WHEREFORE, the State respectfully asks this Court for the following relief:

(a) The entry of a declaratory judgment that all Service Contracts are unenforceable because they lack essential terms;

(b) The entry of a declaratory judgment that all Service Contracts are unenforceable because they were signed under duress;

(c) The entry of a declaratory judgment that all Service Contracts are fraudulent because they conceal material rights from each respective consumer;

(d) The entry of a declaratory judgment that all Service Contracts representing Digital Transactions are fraudulent because their signatures were induced by fraud;

(e) The entry of a declaratory judgment that all Service Contracts are void as *ultra vires* acts of the Defendant;

(f) The entry of a declaratory judgment that all Service Contracts whose alleged amount exceeds $25,000 were unauthorized and are thus voidable;

(g) The entry of a declaratory judgment that all Notices of Lien or amended liens signed by anyone other than Eduardo Arredondo are unenforceable;

(h) The entry of a declaratory judgment that all of the Defendant's recorded liens related to its pending causes of action were not, and cannot now be, properly perfected under NRS Chapter 108;

(i) The entry of a declaratory judgment that all of the Defendant's liens that state lien amounts which include significant amounts for non-lienable services or non-lienable charges are void;

(j) The entry of a declaratory judgment that the Defendant engaged in consumer fraud in all instances described in Count IX(J) of the State's complaint;

(k) The entry of a declaratory judgment that the Defendant's pending causes of action against former customers were not properly authorized, and cannot now be properly ratified;

(l) The entry of a declaratory judgment that the Defendant's pending causes of action constitute an abuse of process of Nevada's mechanic's lien laws;

(m) The entry of a declaratory order that the causes of action listed on Part 11 of Schedule A/B of the Debtor's Schedules are not properly part of the Debtor's bankruptcy estate; and

(n) The entry of such other orders and relief which the Court may deem just and proper.

Dated this 10th day of February, 2022.

SUBMITTED BY:

AARON D. FORD
Attorney General

/s/ Lucas J. Tucker
LUCAS J. TUCKER
Senior Deputy Attorney General
Nevada Bar No. 10252
MARK KRUEGER
Chief Deputy Attorney General
Nevada Bar No. 7410
8945 W. Russell Road, Suite 204
Las Vegas, Nevada 89148
Phone: 702-486-3256
ltucker@ag.nv.gov
mkrueger@ag.nv.gov
*Attorneys for the State of Nevada*